# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 41

OCTOBER TERM, A.D. 2020

*March 9, 2021*

BRADLEY MICHAEL ELMORE,

**Appellant**
**(Defendant),**

**v.**

S-20-0172

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Albany County*
*The Honorable Tori R.A. Kricken, Judge*

*Representing Appellant:*
>    R. Michael Vang of R. Michael Vang P.C., Laramie, Wyoming

*Representing Appellee:*
>    Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Kristen R. Jones, Assistant Attorney General

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice**.

[¶1]     Bradley Elmore appeals the denial of his motion to suppress evidence below.  He claims on appeal that his failure to maintain a single lane of travel on two separate occasions did not create the reasonable suspicion required to justify stopping his vehicle.  Marijuana was found in a free-air K-9 sniff during the stop.  We affirm.

## ISSUES

[¶2]     Did the district court err when it denied Mr. Elmore's motion to suppress?

## FACTS

[¶3]     On July 28, 2019, Wyoming Highway Patrol Trooper Aaron Kirlin was parked on the median near mile post 308 on Interstate 80 monitoring traffic with his drug-detection dog, Frosty.  At approximately 8:44 p.m., Trooper Kirlin observed a silver rental vehicle bearing California plates traveling east on Interstate 80 cross roughly two feet over the dotted center white line separating the two lanes of traffic for about an eighth of a mile before correcting itself.

[¶4]     Trooper Kirlin followed the vehicle, and approximately two minutes later he observed it cross the center line a second time.  After observing the second traffic violation, he activated his flashing lights and initiated a traffic stop.  He made contact with the driver of the vehicle, who was later identified as Bradley Elmore.  Mr. Elmore informed Trooper Kirlin that the vehicle was a rental and provided him with the rental agreement.  The rental agreement listed "John Griffin Delles" as the person who had rented the vehicle.  Trooper Kirlin requested a cover unit to assist him, and an officer identified in the record as Deputy Carroll arrived at the scene.  While Deputy Carroll called the rental company to inquire about the agreement, Trooper Kirlin deployed his K-9 Frosty, who alerted to the presence of controlled substances in the vehicle.  Trooper Kirlin then searched the vehicle and found a small amount of marijuana in the passenger compartment and nine duffel bags containing approximately 127 pounds of marijuana in the trunk.

[¶5]     Mr. Elmore was charged with possession of a controlled substance, a felony, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(i)(A), and unlawful possession with intent to deliver a controlled substance in violation of Wyo. Stat. Ann. § 35-7-1031(a)(ii), a felony.  On September 10, 2019, defense counsel moved to suppress the evidence found in the vehicle.  He argued that the two minor deviations from Mr. Elmore's lane of travel did not create the reasonable suspicion required to justify the initial traffic stop.

[¶6]     Following an evidentiary hearing, the district court denied the motion to suppress, holding that absent any adverse conditions, the two deviations from a single lane of travel, taken together with the surrounding circumstances, gave rise to reasonable suspicion that

1

a traffic violation had occurred. Accordingly, it found that Trooper Kirlin had reasonable suspicion to stop the vehicle.

[¶7]     Mr. Elmore subsequently entered a conditional plea of guilty to possession of a controlled substance. The district court sentenced him to three to five years in prison, suspended in favor of two years of probation, and he timely appealed.

## STANDARD OF REVIEW

[¶8]     Mr. Elmore challenges the district court's denial of his motion to suppress under the Fourth Amendment to the United States Constitution and Article I, § 4 of the Wyoming Constitution.[1]

> In reviewing a denial of a motion to suppress evidence, we adopt the district court's factual findings unless those findings are clearly erroneous. *Rodriguez v. State*, 2018 WY 134, ¶ 15, 430 P.3d 766, 770 (Wyo. 2018) (citing *Jennings v. State*, 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016)). We view the evidence in the light most favorable to the district court's decision because the court conducted the hearing and had the opportunity to "assess the witnesses' credibility, weigh the evidence and make the necessary inferences, deductions and conclusions." *Kunselman v. State*, 2008 WY 85, ¶ 9, 188 P.3d 567, 569 (Wyo. 2008) (quoting *Hembree v. State*, 2006 WY 127 ¶ 7, 143 P.3d 905, 907 (Wyo. 2006)). "On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling of the court below if supported by any reasonable view of the evidence." *Feeney v. State*, 2009 WY 67, ¶ 9, 208 P.3d 50, 53 (Wyo. 2009) (citing *Neilson v. State*, 599 P.2d 1326, 1330 (Wyo. 1979)). "The ultimate question of whether the search or seizure was legally justified, however, is a question of law we review de novo." *Rodriguez*, ¶ 15, 430 P.3d at 770.

*Pryce v. State*, 2020 WY 151, ¶ 16, 477 P.3d 90, 94-95 (Wyo. 2020) (quoting *Brown v. State*, 2019 WY 42, ¶ 10, 439 P.3d 726, 730 (Wyo. 2019)).

---

[1] Mr. Elmore referred to the Wyoming Constitution in his motion to suppress, but he provided no cogent argument as to how the initial stop violated Article I, § 4 of the Wyoming Constitution. "General citation to the Wyoming Constitution does not suffice to preserve a state constitutional argument for appeal, nor does citation to cases decided under the Wyoming Constitution without argument concerning how they apply to the case under consideration." *Gibson v. State*, 2019 WY 40, ¶ 13, 438 P.3d 1256, 1259 (Wyo. 2019) (internal citation omitted). Accordingly, we confine our review to his Fourth Amendment claim.

## DISCUSSION

[¶9]    The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures."   U.S. Const. amend. IV.   Under the Fourth Amendment, there are "three tiers of interaction between law enforcement and citizens: consensual encounters, investigatory detentions and arrests." *Simmons v. State*, 2020 WY 132, ¶ 11, 473 P.3d 1259, 1262 (Wyo. 2020) (citation omitted).   Mr. Elmore's interaction with law enforcement began as a traffic stop, which is an investigatory detention.

[¶10]   Mr. Elmore's sole claim is that Trooper Kirlin did not have reasonable suspicion to justify the initial traffic stop.   Because it is an investigatory detention, a traffic stop must comply with the Fourth Amendment. *Kennison v. State*, 2018 WY 46, ¶ 13, 417 P.3d 146, 149 (Wyo. 2018) ("A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment.") (quoting *Allgier v. State*, 2015 WY 137, ¶ 14, 358 P.3d 1271, 1276 (Wyo. 2015)).

> To justify a traffic stop, the trooper must have "reasonable suspicion—that is, a particularized and objective basis" to suspect the motorist is violating the law. The trooper's conduct is judged by "'an objective standard which takes into account the totality of the circumstances.'" "[W]hile the test is objective, the [trooper]'s training, experience, and expertise are to be considered as part of the totality of the circumstances."

*Simmons*, ¶ 12, 473 P.3d at 1262 (quoting *Robinson v. State*, 2019 WY 125, ¶ 22, 454 P.3d 149, 156 (Wyo. 2019)).

[¶11]   Wyo. Stat. Ann. § 31-5-209(a)(i) (LexisNexis 2019) specifies that when a roadway is divided into two or more clearly marked lanes "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety."   As previously noted, Trooper Kirlin observed Mr. Elmore's vehicle cross roughly two feet over the center line for about an eighth of a mile twice.

[¶12]   Mr. Elmore first challenges the veracity of Trooper Kirlin's observations and claims that the dash camera video contradicts his version of events.   Alternatively, he claims that his lane deviations do not give rise to reasonable suspicion that he violated § 31-5-209(a)(i).   He contends his action in the first deviation could not support a reasonable suspicion because it could be explained—he was preparing to pass a semi-truck and crossed the center line to avoid Trooper Kirlin's parked patrol vehicle by a wider margin.   He further contends that neither deviation could arouse reasonable suspicion because he was not

3

required to maintain a "perfect vector," and that his deviations were minor and did not endanger others.

[¶13] The district court found as follows (footnotes omitted):

> 1. While on patrol at approximately 8:44 p.m. on July 28, 2018, Trooper Aaron Kirlin, of the . . . Wyoming Highway Patrol, was parked on [the] median of the highway, approximately six-to-eight feet onto the median from the passing lane, when he observed a silver rental vehicle bearing California plates traveling eastbound on Interstate-80. The weather was clear and the roads dry, though the sun was setting.
>
> 2. Near mile marker 308, Trooper Kirlin observed the silver rental vehicle cross roughly two feet over the dotted center white line for about an eighth of a mile before correcting itself. After Trooper Kirlin began to follow the vehicle, he observed the vehicle cross the center white-dotted line for a second time, for about the same distance and to about the same degree. Trooper Kirlin's testimony at the hearing is corroborated by the dash camera DVD footage from Trooper Kirlin's patrol vehicle which, while somewhat difficult to discern on the DVD, does depict the vehicle crossing the dotted lane line twice, consistent with the trooper's testimony. Additionally, Trooper Kirlin can be overheard in the video noting aloud each time he observed the vehicle depart from its lane of travel.
>
> \*   \*   \*
>
> 21. Mr. Elmore asserts that his driving actions were not particularly egregious and were justified in that he "only drove over the dotted white passing line for a short distance, which was justified under the facts and circumstances of his case to make room for Trooper Kirlin's parked vehicle, as Mr. Elmore was getting ready to pass a semi-truck." . . . .
>
> 22. Having reviewed the dash camera video from Trooper Kirlin's patrol vehicle and based on the testimony provided at the suppression hearing, this Court disagrees. Mr. Elmore points to no adverse conditions (such as high winds, sharp curves, or damaged pavement) to justify the departure from his

4

lane of travel, nor can this Court locate any such conditions on the DVD. *See Dods* [*v. State,* 2010 WY 133], ¶ 15, 240 P.3d [1208,] 1211 [(Wyo. 2010)]. While Mr. Elmore's contention that he properly and safely moved partially from the passing lane into the right lane in order to give Trooper Kirlin's parked patrol vehicle more room the first time Mr. Elmore crossed the center line, Mr. Elmore offers no explanation for why he crossed the center line a second time shortly thereafter. Also, Trooper Kirlin testified that there was no requirement to "move over" or make room for law enforcement vehicles unless the emergency lights were activated. Here, Trooper Kirlin's were not.

23.     Absent adverse conditions or the like, these two deviations from a single lane of travel, taken together with the surrounding circumstances, give rise to reasonable suspicion that a traffic violation has occurred. Consequently, Trooper Kirlin's decision to stop Mr. Elmore's vehicle was justified at its inception.

[¶14]   We have reviewed Trooper Kirlin's dash camera footage. His vehicle was parked approximately six to eight feet into the median with his right tire just off the asphalt surface of the road. At approximately 8:43:55 p.m., a semi-truck passed his parked vehicle, followed by a silver vehicle that straddled the center line some distance behind the semi-truck. Trooper Kirlin testified that the vehicle "crossed over the center dotted line for about an eighth of a mile before correcting and coming back into the correct lane" and on the dash camera footage at approximately 8:44:13, Trooper Kirlin stated that he observed Mr. Elmore's vehicle cross over the center line.

[¶15]   Approximately sixteen seconds before Trooper Kirlin announced the lane violation, the video from camera 2, which captured the view from Trooper Kirlin's passenger side, shows that the silver vehicle was driving over the center line with no turn signal to indicate that it was in the process of changing lanes. It continued to straddle the white dotted line, with no vehicle next to it, for approximately seven more white dotted lines before the vehicle moved into the center of the passing lane. The vehicle straddled the center line with its tires in both lanes of traffic for approximately four seconds, until the vehicle is no longer clearly visible. After observing Mr. Elmore's vehicle driving over the center line, Trooper Kirlin began to follow it.

[¶16]   Before Trooper Kirlin began to follow Mr. Elmore's vehicle, a dark van driving in the right lane passed his patrol vehicle at approximately 8:44:00. At some point, though it is not all that clear in the video, the van moved from the right lane into the left passing lane of traffic, directly in front of Trooper Kirlin's patrol vehicle. At approximately 8:45:19,

the van signaled and began to move from the left lane to the right lane. At 8:45:21, Trooper Kirlin reported on the patrol car audio that Mr. Elmore's vehicle was "over the center line again." At that point, the road was straight, flat, and clear. Additionally, as the district court found, the weather was clear, the sun was setting, and the roads were dry.

[¶17] The van in front of Trooper Kirlin obstructed the camera's view of Mr. Elmore's vehicle, and we are unable to discern for how long Mr. Elmore deviated from his lane of travel the second time Trooper Kirlin testified that he did so. However, at 8:45:21, when the van moved into the right lane, the video shows that Mr. Elmore's vehicle was over the center line. There was a semi-truck in the right lane that Mr. Elmore's vehicle appears to have been attempting to pass, but the video does show that his vehicle was rather close to the rear of the semi-truck and that he had straddled the center line. We are unable to discern the precise distance between the semi-truck and Mr. Elmore's vehicle from the video.

[¶18] At approximately 8:45:23 p.m., Mr. Elmore started to move back into his lane of travel, away from the dotted center line toward the yellow solid line on the left side of the road, and by approximately 8:45:25, he was again driving in the center of the left lane. At 8:45:36, Mr. Elmore stepped on his brakes, signaled a lane change, and moved from the left lane into the right lane of traffic behind the semi-truck. Trooper Kirlin then initiated the traffic stop.

[¶19] Mr. Elmore's assertion that Trooper Kirlin's observation and testimony is contradicted by the audio and video recording is contrary to the district court's factual findings. "A trial court's specific findings of fact are presumed to be correct . . . unless they are clearly erroneous." *Maestas v. State*, 2018 WY 47, ¶ 7, 416 P.3d 777, 780 (Wyo. 2018). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Simmons*, ¶ 17, 473 P.3d at 1263. Viewing the evidence in the light most favorable to the district court's determination, we conclude that its findings were not clearly erroneous. We also reject Mr. Elmore's claim that his first lane deviation was reasonable because he was passing a semi-truck and moved to the right to make room for Trooper Kirlin's vehicle.

[¶20] First, his explanation is undermined by the distance between his vehicle and the semi-truck, and by the fact that he did not signal a lane change to indicate that he was moving into the right lane due to the patrol vehicle parked in the median. Additionally, we judge the reasonableness of an officer's suspicion based on information that was available to him at the time of the stop, not with reference to later-obtained information. *Jennings v. State*, 2016 WY 69, ¶ 10, 375 P.3d 788, 791 (Wyo. 2016). According to Trooper Kirlin's testimony, Wyoming drivers are not required to move over unless a patrol vehicle's lights are activated, and we cannot expect the trooper to have known Mr. Elmore's claimed reasoning and to have factored it into his observations. In any event, as the district court

6

noted, even if Mr. Elmore crossed the center line the first time to make room for Trooper Kirlin's parked vehicle, that does not explain the second lane deviation.

[¶21]   Next, we turn to Mr. Elmore's claim that neither deviation could provide reasonable suspicion to stop him because each deviation was minor and did not endanger others.  He contends that the "as nearly as practicable" language in § 31-5-209(a)(i) does not require a "perfect vector," and that since he only had two minor deviations outside his lane of travel, and they did not pose a danger to other traffic, there could not have been reasonable suspicion sufficient to justify an investigatory detention for failing to maintain a single lane of travel.

[¶22]   In *Dods v. State*, we first interpreted the "as nearly as practicable language" and held that it precludes "absolute standards," and also that it requires a fact-specific inquiry to assess whether an officer has reasonable suspicion to believe that a violation has occurred.  2010 WY 133, ¶ 18, 240 P.3d 1208, 1212 (Wyo. 2010).  We concluded that a trooper's stop of a vehicle was justified after he observed its "passenger side tires cross the white fog line by approximately eight inches for about five seconds/several hundred yards." *Id.* ¶¶ 3, 17-19, 240 P.3d at 1209, 1212.  We explained that a single lane deviation could be a violation of § 31-5-209(a)(i), and that the record in that case supported a finding of the required reasonable suspicion under those circumstances because the defendant had not pointed to any objective factor that might have made it impractical for him to remain in his lane.  *Id.* ¶¶ 16-17, 240 P.3d at 1211-12.

[¶23]   We adhered to that interpretation in *Tiernan v. State, Dep't of Transp.*, 2011 WY 143, ¶ 16, 262 P.3d 561, 566 (Wyo. 2011), *overruled on other grounds by Allgier*, ¶ 9, 358 P.3d at 1276.  Then a year later, in 2012, we again reaffirmed our holding in *Dods*, and we rejected an argument that the "as nearly as practicable language" should be interpreted to require that the failure to maintain a lane endanger others.

> As an initial matter, we note that Mr. Espinoza expends a great deal of space in his brief analyzing the meaning of § 31-5-209 and arguing that, given the statutory imperative that a driver maintain his lane to the extent "practicable," we should interpret the statute as only prohibiting failing to maintain a lane if another vehicle/driver is placed in danger. This Court discussed § 31-5-209 at length in *Dods v. State*, 2010 WY 133, 240 P.3d 1208 (Wyo.2010). We considered case law from other jurisdictions interpreting statutes with language similar to our "as nearly as practicable" requirement and concluded:
>
>> We . . . agree with the [Tenth Circuit's] assessment that a court must examine all of the surrounding circumstances to determine whether there is a

justification for the stop. . . . Under adverse weather and/or road conditions, any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity. [*United States v.*] *Gregory*, 79 F.3d [973,] 978 [(10th Cir. 1996)]. We keep in mind that *Gregory*, however, does not create a "bright-line rule" of what conduct constitutes a violation of this type of statute, but rather "highlight[s] the need to analyze objectively ***all the surrounding facts and circumstances***" to determine whether the officer had a reasonable suspicion to make the stop. [*United States v.*] *Ozbirn*, 189 F.3d [1194,] 1198 [(10th Cir. 1999)] (emphasis added). Based upon such a fact-sensitive analysis, one or two deviations from a lane may or may not constitute a violation, depending on the circumstances. While it might not be reasonable to expect a driver to avoid even the slightest deviation from a lane over an extended distance, it may be reasonable to expect drivers to avoid a sudden, significant deviation from the lane or a sudden, over-compensating return back, absent physical obstacles, mechanical difficulty, or other uncontrollable circumstances. *State v. Woodruff*, 403 N.J.Super. 620, 629, 959 A.2d 1233, 1239 (Law Div.2008).

> *Id.*, ¶ 16, 240 P.3d at 1211-12. Mr. Espinoza has not convinced us that we should waver from our decision in *Dods*, and we will continue to follow that approach without superimposing a requirement that any lane deviation put another driver into danger before the statute is violated.

*Espinoza v. State ex rel. Wyoming Dep't of Transp.*, 2012 WY 101, ¶ 9, 280 P.3d 1226, 1230 (Wyo. 2012), *overruled on other grounds by Allgier*, ¶ 9, 358 P.3d at 1276 (footnotes omitted).

[¶24]  Mr. Elmore has not shown us that our rulings in *Dods*, *Tiernan*, and *Espinoza* are not controlling, nor has he distinguished them. We thus adhere to our precedent and look to the totality of the circumstances to determine whether Trooper Kirlin's decision to stop Mr. Elmore's vehicle was supported by reasonable suspicion. Our de novo review of the ultimate determination regarding the constitutionality of the initial stop in this case leads us to conclude that Trooper Kirlin's actions did not violate the Fourth Amendment. Trooper Kirlin's testimony, together with the dash camera footage, supports the district

court's legal conclusion that reasonable suspicion supported the initial stop based on its findings of fact. Accordingly, we conclude that the district court properly denied the motion to suppress.

[¶25] Affirmed.